James F. Grosso, O'Reilly & Grosso, Southborough, MA, for T Equipment Corp.

James F. Grosso, (See above), for C.R.C. Co., Inc., plaintiff.

Paul F. Kelly, Segal, Roitman & Coleman, Boston, MA, for Massachusetts Laborers' Dist.

**T EQUIPMENT CORPORATION and C.R.C. Co., Inc., Plaintiffs,**

v.

**MASSACHUSETTS LABORERS' DISTRICT COUNCIL, Defendant.**

Civil Action No. 96–12458–JLT.

United States District Court, D. Massachusetts.

Dec. 15, 1997.

*MEMORANDUM*

TAURO, Chief Judge.

This action arises out of a disputed work assignment given in connection with a railroad renovation project known as the Old Colony Railroad project (the "Project"). Plaintiffs T Equipment Corporation ("TEC") and C.R.C. Company, Inc. ("CRC") (referred to jointly as the "Employers") seek

vacatur of an arbitration award of payment-in-lieu damages entered against them and in favor of the Laborers' Union, Local 721, for work assigned to, and performed by, the Carpenters' Union, Local 624. Conversely, defendant Massachusetts Laborers' District Council, representing the interests of the Laborers' Union, seeks enforcement of that award. Presently before the court are the parties' cross-motions for summary judgment.

## I.

## BACKGROUND

TEC and C.R.C. are Massachusetts corporations engaged in commerce within the meaning of the Labor Management Relations Act ("LMRA"). At all relevant times, the plaintiff corporations were signatories to collective bargaining agreements with both the Laborers' Union and the Carpenters' Union.

The Project at issue included the construction of seven railroad stations and the reconstruction of approximately eight railroad bridges. The Project's general contractor, J.F. White Contracting Company, subcontracted bridge work to TEC and certain substructural work to CRC. The portion of the Project giving rise to this dispute commenced at CRC's Weymouth station construction site in May of 1995 and was completed in May of 1996.

In particular, the disputed assignment involved the removal of concrete forms after concrete had been poured and allowed to cure, a task commonly referred to as "stripping." Stripping is the last step in the process of setting concrete. Before stripping can occur, carpenters erect concrete forms, which are typically used to create walls and foundations. Laborers aid the carpenters in this initial process by handling and moving forms to the point of erection. After the forms have been set in place and secured with hardware known as whalers, ties, and strongbacks, concrete is poured into them. When the concrete has set and cured, the hardware is removed and the forms are stripped from the concrete. Both the Carpenters' Union and the Laborers' Union have historically claimed the stripping of concrete forms as work within their respective trade jurisdictions.

In June of 1995, the Employers assigned stripping work exclusively to the Carpenters' Local, and the Carpenters allegedly claimed such work as their own.[1] Plaintiffs contend that the Laborers' Union then physically attempted to perform the stripping work, requiring the Plaintiffs to contact municipal police forces to remove the Laborers from the job site. Thereafter, the Laborers contested the work assignment under the collective bargaining agreement, pursuing informal grievance procedures without success. On July 21, 1995, the Laborers' Union demanded arbitration. Defendant Massachusetts Laborers' District Council processed the grievance to arbitration, and, on September 20, 1995, the American Arbitration Association scheduled an arbitration hearing for November 14, 1995.

On the day of the scheduled arbitration hearing, Plaintiffs filed an unfair labor practice charge with the National Labor Rela-

---

1. Some confusion ensued at the motions hearing with regards to the respective numbers of Laborers and Carpenters who performed the actual stripping of concrete forms at the Weymouth station. According to both parties' papers, however, the court appears to have been correct in its original understanding that the Carpenters performed *all* of the stripping. *See* Memorandum in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment, p. 2 (stating that, "[i]n June of 1995 representatives of Carpenters Local 424 claimed 100% of the stripping work of CRC's Weymouth station site"); Plaintiff's Memorandum in Support of Motion for Summary Judgment, p. 1 (stating that "Plaintiffs assigned the disputed work to its employees represented by the Carpenters' Union").

The defendant asserts that the Carpenters' Union appropriated all of the stripping work despite a written agreement between the Carpenters and Laborers, which states that "[a]ll stripping shall be done by a composite crew of an equal number of Carpenters and Laborers." Defendant's Statement of Undisputed Material Facts, Exhibit B. Likewise, the defendant proffers a Recommended Labor Policy promulgated by the Associated General Contractors of Massachusetts, which states that "[s]tripping of forms ... shall be assigned to a composite crew of carpenters and laborers...." Defendant's Statement of Undisputed Material Facts, Exhibit C.

tions Board ("NLRB" or the "board") against the Carpenters' Union, alleging that it had "threatened to engage in a refusal to work and other illegal activity" due to the stripping dispute. Plaintiffs' counsel then appeared before the arbitrator and stated that the filing of the charge deprived the arbitrator of jurisdiction. This delayed the arbitration proceeding until June 4, 1996. The arbitration eventually recommenced, and, on November 4, 1996, Arbitrator Michael Stutz determined that Plaintiffs had violated their collective bargaining agreement with the Laborers' Union by assigning the stripping work exclusively to the Carpenters. Accordingly, Arbitrator Stutz awarded the Laborers pay-in-lieu of work.

In the interim, the NLRB held a jurisdictional dispute hearing pursuant to § 10(k) of the National Labor Relations Act ("NLRA" or the "Act") and, on October 30, 1996, determined that Plaintiffs had properly assigned the entirety of their stripping work to the Carpenters. Union.

## II.

### ANALYSIS

#### A. Summary Judgment Standard

Summary judgement is appropriate where the record reveals no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Flanders & Medeiros, Inc. v. Bogosian*, 65 F.3d 198, 201 (1st Cir .1995). In assessing a motion for summary judgment, the court must look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-

vits, if any." Fed.R.Civ.P. 56(c). Here, no material issues of fact exist.

#### B. The Viability of Payment–in–Lieu Arbitration Awards[2]

In support of their request for vacatur, the Employers argue that, once the NLRB asserts jurisdiction over the merits of a work assignment dispute between two rival unions, and determines that the work should be assigned to employees represented by one of those unions, the other union may not pursue a claim through arbitration proceedings for the reassignment of that same work or for back pay.

Conversely, the Laborers' Council argues that a 10(k) proceeding addresses only the narrow issue of which union has the superior claim to work, and is neither final nor binding. The Council further asserts that the aggrieved, noncharged union should, therefore, be able to contest the work assignment through arbitration as violating the collective bargaining agreement.[3]

The First Circuit has not yet addressed the issue of whether an arbitration award requiring payment of damages to one union for breach of the relevant collective bargaining agreement will survive in a case where the NLRB has awarded the underlying work to another union. In fact, the First Circuit explicitly declined to reach this issue in *J.F. White Contracting Co. v. Local 103 Int'l Brotherhood of Elec. Workers*, stating,

> The matter before us ... is simply whether the district court properly vacated an arbitrators' [sic] award that ordered the employer to "cease and desist" from giving the Laborers the work. We do not see how that invalid award, by itself, can pro-

**2.** Plaintiffs' contention that the Laborers' Union cannot, through arbitration, attain the work assigned to the Carpenters' Union and approved by the NLRB, though irrelevant to this case (Arbitrator Shuts did not, after all, award *work*, but only *damages* ), is well-founded. In fact, this court issued an opinion addressing the issue, which then Chief Judge Breyer, sitting with the First Circuit, affirmed. Specifically, in *J.F. White Contracting Co. v. Local 103 Int'l Brotherhood of Elec. Workers*, 890 F.2d 528 (1st Cir. 1989), the circuit court found that the district court had properly vacated an arbitration award that ordered an employer to take from a union "the very work that the NLRB had said [that

union] should have." *Id.* at 529. More generally, the court cited *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964) for the proposition that, "[s]hould the Board disagree with [an] arbiter" over a jurisdictional dispute, "the Board's ruling w[ill], of course, take precedence ." *Id.* at 272, 84 S.Ct. at 409.

**3.** The defendant describes the Laborers' Union as "noncharged" because the Employers instituted the NLRB proceeding against the Carpenters' Union.

vide a basis for the court to award damages.

*White,* 890 F.2d at 531.[4]

Several courts in other circuits have, however, confronted issues similar to the one at hand. In particular, the Fifth, Seventh and Ninth Circuits, as well as various district courts in those circuits, have addressed the enforceability of payment-in-lieu of work awards. In these cases, the query that lies at the core of the courts' decisions is whether there exists a "facial ... conflict between the arbitrator's award and [the] NLRB action," *General Warehousemen and Helpers Local 767 v. Standard Brands, Inc.,* 560 F.2d 700, 704 (5th Cir.1977), which renders the award invalid as "'repugnant to the NLRA.'" *District Council of Iron Workers of State of California and Vicinity, AFL—CIO v. Swinerton & Walberg, Inc.,* 752 F.Supp. 344, 346 (N.D.Cal.1990) (quoting *Van Waters & Rogers Inc. v. Int'l Brotherhood of Teamsters Local Union 70,* 913 F.2d 736 (9th Cir.1990)).

The answer to this question, in turn, varies with the subject matter of the arbitrated contractual dispute and the effect upon the employer of enforcing the arbitral award. For example, the Seventh Circuit has found, in several cases involving breach of a collective bargaining agreement's subcontracting clause, that an NLRB determination of a jurisdictional dispute between two unions does not preclude the aggrieved union from pursuing that subcontracting clause grievance. *Miron Construction Co., Inc. v. Int'l Union of Operating Engineers, Local 139,* 44 F.3d 558 (7th Cir.1995). *See also Associated General Contractors, Inc. v. International Union of Operating Engineers Local 701,* 529 F.2d 1395 (9th Cir.), *cert. denied,* 429 U.S. 822, 97 S.Ct. 72, 50 L.Ed.2d 84 (1976) (enforcing an arbitration award of damages where the employer violated the collective bargaining agreement's subcontracting clause by hiring a subcontractor who had no contact with the union). Additionally, the Seventh Circuit has held that such a determination does not preclude enforcement of a subsequent arbitration award of backpay in this type of breach of contract case. *Hutter Construction Co. v. Int'l Union of Operating Engineers, Local 139, AFL—CIO,* 862 F.2d 641 (7th Cir.1988). In reaching this conclusion, the court reasoned that the employer could comply with both the collective bargaining agreement and the NLRB determination in the first instance, thereby avoiding both the incurrence and payment of damages.[5] Accordingly, allowing payment-in-lieu awards in such cases does not penalize the employer for making an untenable choice. Rather, it penalizes the employer for failing to fulfill its simultaneously tenable obligations.

Contrarily, the Ninth Circuit has held, in a case involving a breach of a collective bargaining agreement's work assignment provisions, that an NLRB determination of the corresponding jurisdictional dispute precludes payment-in-lieu damages and, accordingly, requires vacatur of an arbitration award granting such damages.[6] *Swinerton,*

---

**4.** By stating, at the motions hearing, that Arbitrator Stutz's award cannot stand because it conflicts with the NLRB's work assignment determination, Plaintiffs' counsel simply begged the question left open by *White:* Does an award of damages, rather than of the contested work assignment itself, to one union necessarily conflict with an NLRB jurisdictional decision that favors another union?

**5.** In particular, the employer could fulfill both its contractual obligations to the Local 701 and its obligations under the NLRB decision because the NLRB determination stated that the employer's current subcontractor was bound to use Teamsters members on its concrete pumps. It did not, however, bind the employer to use that subcontractor. As a result, the employer could replace the current subcontractor with another that was signatory to the Local 701 collective

bargaining agreement, thereby complying simultaneously with the NLRB order and the collective bargaining agreement.

**6.** Several cases declaring suits to enforce such arbitration awards unfair labor practices effectively buttress the assertion that courts should not enforce a payment-in-lieu of work awards in favor of one union where the NLRB has awarded the underlying work to another union. *See Local 30, United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association, AFL—CIO v. National Labor Relations Board,* 1 F.3d 1419, 1425 (3rd Cir.1993)(holding that maintenance of a suit by the losing union in an NLRB jurisdictional dispute to confirm a corresponding favorable arbitration award amounts to an unfair labor practice); *United Union of Roofers, Waterproofers and Allied Workers, Local Union No. 30 v. Gundle Line Construction Corp.,* 1

752 F.Supp. at 345. In reaching this conclusion, the court reasoned that "an arbitration award of damages in favor of petitioner would place [the employer] 'between the devil and the deep blue.'" *Id.* (quoting *Associated General Contractors,* 529 F.2d at 1397). Forcing the employer to pay damages under these circumstances, the court concluded, would "violate congressional intent by penalizing [the employer] for complying with the NLRB's work assignment." *Id.*

Likewise the Fifth Circuit, in *International Union of Operating Engineers v. Sullivan Transfer,* 650 F.2d 669 (5th Cir.1981), noted that "[t]o allow a nonprevailing union to sue an employer for *damages* when that employer acts in conformity with a Section 10(k) determination would run counter to [Congress'] ... clearly expressed ... policy" in favor of prompt and lasting settlement of jurisdictional disputes. *Id.* at 677 (emphasis added). In effect, the court elucidated the general policy concerns shared by most courts, tying them directly to the issue of payment-in-lieu damages.[7] *See UAW Local 1519 v. Rockwell Int'l Corp.,* 619 F.2d 580 (6th Cir.1980) (holding that, once the NLRB decides a work assignment dispute, its determination takes precedence over a contrary arbitrator's award); *General Warehousemen and Helpers Local 767 v. Standard Brands, Inc.,* 560 F.2d 700 (5th Cir.1977) (ruling that the court will not enforce an arbitral decision that conflicts with the NLRB decision).

Given this persuasive precedent, this court concludes that forcing an employer to pay damages in circumstances such as these would violate congressional intent by penalizing that employer for merely complying with an NLRB order. The facts here mirror those in *Swinerton.*[8] As in *Swinerton,* the NLRB's work assignment to the carpenters in this case "was unconditional, and the duty to comply with that award ran to the [employer]." *Id.* at 345. In effect, an arbitration award of damages in favor of the Laborers' Union would, like an award of reassignment, place the employer between the proverbial rock and a hard place: given that the disputed work was ongoing, the employer would be "'faced with the choice of violating an NLRB order or paying damages.'" *Id.* (quoting *Associated General Contractors,* 529 F.2d at 1397).

But more fundamentally, allowing the Laborers' Union to replicate the 10(k) dispute in the arbitral realm by repackaging it as a breach of contract dispute would dilute the practical authority of the NLRB. Section 10(k) of the Act provides:

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph ..., the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the

---

F.3d 1429 (3rd Cir.1993) (same); *International Longshoremen's and Warehousemen's Union, Local 32 v. Pacific Maritime Ass'n,* 773 F.2d 1012 (9th Cir.1985) (same).

**7.** At oral argument of these motions, the Laborers' Council cited *National Labor Relations Bd. v. International Longshoremen's and Warehousemen's Union, Local No. 50,* 504 F.2d 1209 (9th Cir.1974), as providing the strongest support for its proposition that the court should enforce the arbitration award despite the NLRB decision. That case, however, dealt with judicial review of an NLRB decision under the arbitrary and capricious standard. The court, therefore, finds the case inapplicable to the matter at hand.

**8.** Like the arbitrator in *Swinerton,* Arbitrator Stutz looked to the relevant collective bargaining agreements' work assignment provisions, as well as to past practice in the area of work assignments, to a contract between the Unions regarding work assignments, and to the Associated General Contractors' recommended labor policy regarding work assignments. Similarly, the NLRB, in hearing a 10(k) dispute, is directed to utilize such factors as area practice, contractor practice, collective bargaining agreements, safety and skills, and economy and efficiency of operation. *See NLRB v. Radio and Television Engineers,* 364 U.S. 573, 582, 81 S.Ct. 330, 336, 5 L.Ed.2d 302 (1961) (holding that "[although] it might be better ... to intrust [jurisdictional disputes] to arbitrators, ... Congress, after discussion and consideration, decided to intrust this decision to the Board").

decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

29 U.S.C. § 160(k). Certainly, the main objective of this section, like the Act in its entirely, is the promotion of "industrial peace," *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957), through ordered resolution—whether voluntary or imposed—of industrial disputes. Because, in this case, the interested parties did not voluntarily adjust their jurisdictional dispute, the Board retained the power to hear and resolve that dispute. Certainly, the Board could have found that Plaintiffs improperly assigned the stripping work to the Carpenters' Union and could have, in turn, awarded appropriate damages to the Laborers' Union. But it did not. Accordingly, the Laborers' Union cannot now be permitted to enforce an arbitration award that would force the Employers to pay damages for complying with the NLRB's decision.

### III.

### CONCLUSION

The plaintiff Employers' Motion for Summary Judgment is ALLOWED and the defendant Council's Cross–Motion for Summary Judgment is DENIED. Arbitrator Stutz's award is, accordingly, VACATED.

